Argued June 5, decided June 18, rehearing denied Oct. 1, 1912.

### VAN DUSEN INV. CO. v. WESTERN FISHING CO.

(124 Pac. 677: 126 Pac. 604.)

**Public Lands—Tidelands—Grant—Confirmation—Effect.**

1. Though no title passed by the State Land Board's deed of a tide flat in a river, given when the State was unauthorized to sell tidelands except on the seashore and coast, yet when, after such sales were authorized by Laws 1891, p. 189, such unauthorized deeds were confirmed by Laws 1899, p. 57, the ratification related back to the date thereof, making them as effective as though originally authorized; no equities of third persons having in the meantime attached.

**Evidence—Presumptions—Tidelands—Erosion.**

2. Under the disputable presumption declared by Section 799, subd. 28, L. O. L., that things have happened in the ordinary course of nature, the head of a tide flat island having, in the 31 years succeeding the State Land Board's unauthorized deed of the island, in 1879, by indiscernible washing thereof, accompanied by imperceptible deposit at its foot, exceeding the erosion, moved in the direction of the foot, 3,000 feet, it will be presumed, as regards the question whether in 1891, when authority for sale by the State of such tide flats was first given, the head had moved beyond the point occupied by the foot in 1879, that it had, in such 12 years, moved $\frac{12}{31}$ of the 3,000 feet.

**Evidence—Presumptions—Innocence—Tidelands—Grant.**

3. In 1879 the State Land Board deeded to plaintiffs tide flats adjacent to the shore in the Columbia River. No authority for selling such flats was given till 1891, and Laws 1899, p. 57, confirmed title to such lands previously sold; the confirmation being limited to purchasers who had not secured from the State to exceed 320 acres of such lands. Laws 1878, p. 42, Sec. 4, authorized such Board to sell tidelands on the seashore and coast, not exceeding 320 acres to any one person, and section 5 (page 43) required application to purchase such lands to be accompanied by applicant's affidavit that he had not made previous purchases from the State, which with the lands specified in the application exceeded 320 acres. Held, that as the application of plaintiffs to purchase the river tide flats was evidently predicated on the act of 1878, and as for them to have secured a greater quantity of tidelands than thus limited they must have

been guilty of perjury, under the presumption, declared by Section 799, subd. 1, L. O. L., that a person is innocent of crime, the execution of the deed to them in 1879 made a prima facie case respecting the title confirmed by the act of 1899, as regards the limitation of 320 acres.

**Evidence—Judicial Notice—Public Survey.**

4. Judicial notice will be taken of the coast and geodetic survey, whereby the ebb and flow of the tide in harbors, bays, and navigable rivers on the Pacific Coast is observed, and from the information thus obtained a "mean lower low water," unaffected by strong prevailing winds or abnormal barometric conditions, is marked on a gauge as an assumed datum-level, designated as zero.

**Public Lands—"Tidelands"—Uncovered Sand Bars.**

5. Sand bars not uncovered by the "mean lower low water," but sometimes exposed when the tide fell below the zero line, by reason of a strong wind or abnormal barometric conditions, are parts of the bed of the stream, and not "tidelands," which alone the State Land Board, under the power given them by Laws 1891, p. 189, to sell tide flats not adjacent to the shore and situate in the tide waters of the Columbia River, is authorized to sell and convey.

**Public Lands—Tidelands—Grant—Validity.**

6. The State Land Board being powerless to grant sand bars constituting part of the bed of the Columbia, and not tide flats thereof, which alone by Laws 1891, p. 189, they are empowered to sell, their deed thereof is void.

**Public Lands—Tidelands—Grant—Collateral Attack.**

7. A decree tantamount to declaring void, as they are, deeds of the State Land Board to sand bars, constituting part of the bottom of the Columbia River, and not tide flats, may be rendered in a collateral proceeding, where adverse rights of strangers are necessarily involved.

**Navigable Waters—Tidelands—Sale—Accretion.**

8. The grantee of tide flats, constituting a tideland island, is entitled to the accretion lodging on and forming a part thereof, though the island as originally granted has gradually moved, so that none of it remains within its location at the time of the grant.

**Navigable Waters—Public Lands—Sale—Accretion.**

9. The rule that the right of a riparian owner to accretions to an island was limited to an extension of his lateral boundaries at right angles with the thread of the stream, and that he is not entitled to any of the gradual and imperceptible accumulations of soil deposited at the head or foot of the island, does not apply in Oregon, where the fee in an island in the bed of a navigable river was sold by the State; the purchaser, under such circumstances, being entitled to the accretion which lodged on and formed a part of the head or foot of the island.

**Appeal and Error—Discretion—Review.**

10. The denial of a motion for leave to offer further evidence, after submission of the case, will not be reviewed, in the absence of a showing of an abuse of discretion.

From Clatsop:   James A. Eakin, Judge.

Statement by Mr. Justice Moore.

This is a suit by the Van Dusen Investment Company, a corporation, Reba Hobson, Edwin Hobson, and Bertha Halderman, against the Western Fishing Company, a corporation, D. H. Welch and Nancy M. Welch, to determine an adverse claim to a sand bar upon which seines for catching salmon are hauled.   The State of Oregon by its land board, consisting of the Governor, Secretary of State, and State Treasurer, on February 17, 1879, executed to John Hobson and A. Van Dusen a deed to real property in Clatsop County near Astoria; the premises being described as follows:

"A small island in the Columbia River, situate in sections 8 and 9, township 8 north of range 9 west, W. M., opposite and due north of the donation land claim of John M. Shively, containing 21.37 acres of tideland."

The State Land Board on July 24, 1889, in order more specifically to identify the island, executed to Hobson and to the heirs of Van Dusen a confirmatory deed, wherein the premises were described by metes and bounds coincident with the low-water mark.   The State Land

Board on August 12, 1889, executed to W. E. Warren a deed purporting to convey real property, containing 9.62 acres, situate about 500 feet west of and down the stream from the nearest point specified in the confirmatory deed. The State Land Board on August 30, 1902, executed to Lena F. Welch a deed to 2.95 acres about 3,100 feet north-westerly down the river from the nearest point of the island described in the deed executed July 24, 1889. The plaintiffs have secured all the estate of Hobson and of Van Dusen in the island first hereinbefore mentioned; the defendant the Western Fishing Company has obtained a deed from Lena F. Welch of her interest in 2.95 acres of land described in the deed executed to her August 30, 1902; D. H. Welch procured from W. E. Warren a deed to the 9.62 acres mentioned in the conveyance of August 12, 1889; and Nancy Welch holds a tax deed for an undivided half of the real property last described.

The island conveyed to Hobson and Van Dusen is a sand bar which at all times has been wholly covered and uncovered by the ordinary flux and reflux of the tides. The lands described in the deeds executed to Warren and to Lena F. Welch have never been exposed, except possibly parts thereof at unusual falls of the sea at the mouth of the Columbia River. These parcels of real property, for the sake of brevity, will be designated, in the order in which they were respecitvely conveyed, as tracts numbered 1, 2, and 3. The current, which at the places mentioned usually flows northwesterly, depending upon the state of the tide, has indiscernibly washed away the head of tract No. 1, and at the foot thereof earth, sand, and gravel have been imperceptibly lodged. The deposit, however, has always exceeded the erosion, and though the island, since February 17, 1879, has existed as an entity, it has gradually moved downstream, constantly increasing in area in an ordinarily unperceived manner,

and no exposed part of it now remains within the boundaries of the confirmatory deed. In the place formerly occupied by that island the water at low tide is now from 9 to 28 feet deep. Tract No. 2 has been wholly washed away, and the depth of low water, at the place which that shoal originally held, is from 27 to 30 feet.

The defendant D. H. Welch having on June 10, 1910, leased, for the purposes of operating seines for taking salmon, the premises specified as tract No. 2, this suit was instituted. The complaint describes by metes and bounds the real property involved herein, which shows that the original area of 21.37 acres had been augmented by accretions to 60.46 acres; the upper line of the island at present being about 1,700 feet west of the lower line of tract No. 1, as conveyed July 24, 1889, and the lower line of such tract now extending to a point about 100 feet easterly and above the upper line of tract No. 3.

The cause being at issue was tried resulting in a decree as prayed for in the complaint, and the defendants appeal.

AFFIRMED: REHEARING DENIED.

For appellants there was a brief over the names of *Mr. James G. Wilson, Mr. William W. Cotton* and *Mr. C. W. Mullins,* with an oral argument by *Mr. Wilson.*

For respondents there was a brief over the names of *Mr. George C. Fulton* and *Mr. Charles W. Fulton,* with an oral argument by *Mr. George C. Fulton.*

MR. JUSTICE MOORE delivered the opinion of the court.

When the deeds were respectively executed February 17, 1879, and July 24, 1889, for tract No. 1, the State was unuthorized to convey tidelands except on the seashore and coast. *Elliott* v. *Stewart,* 15 Or. 259 (14 Pac. 416). An act, however, subsequently empowered the State Land Board to sell "tide flats not adjacent to the shore and situate within the tidewaters of the Columbia River."

Laws Or. 1891, p. 189. A later act confirmed the titles to all tide flats not adjacent to the shore in the waters of the State which had been sold to purchasers who in good faith had paid and the grantor had accepted the consideration for the premises. Laws Or. 1899, p. 57.

It is contended by defendants' counsel that though the complaint stated and the testimony disclosed that the sands, which on February 17, 1879, formed the surface of tract No. 1, were constantly moving westward, no proof was offered tending to show that, when the act of 1891 became operative, any part of the original island was uncovered at the reflux tide within the boundaries specified in the deed of July 24, 1889, and there being no evidence of any shore line of such tract to which accretions could be formed, an error was committed in granting the relief awarded.

1. It may be taken for granted that, in disposing of all State lands, the State Land Board is the duly constituted agent of the State; but, as no power to sell tide flats in the Columbia River was conferred until the enactment of 1891, the deeds executed to plaintiffs' predecessors in interest prior thereto were not within the scope of the agency, and probably no title to the premises was thereby conveyed. *Salem Imp. Co.* v. *McCourt,* 26 Or. 93 (41 Pac. 1105). When, however, the State, as principal, by the enactment of 1899 confirmed the execution of such deeds, the ratification related back to February 17, 1879, when the first conveyance of the premises was executed, thereby making the deed as effective from that moment as though it had been originally authorized. 1 Am. & Eng. Enc. Law (2 ed.) 1213; 31 Cyc. 1283. The doctrine of relation is a legal fiction devised to advance justice, but will not be invoked to defeat or impair intervening rights of third persons who are strangers to the transaction. 24 Am. & Eng. Enc. Law (2 ed.) 277; *Johnson* v. *Jones,* 1 Black,

209 (17 L. Ed. 117).   See, also, on this subject, *Squire*
v. *Princeton Lighting Co.*, 72 N. J. Eq. 883 (68 Atl. 176:
15 L. R. A. [N.S.] 657).   The application of this prin-
ciple cannot prejudice any intermediate equities of other
persons, for neither W. E. Warren nor Lena F. Welch
secured a conveyance of any part of the premises described
in the deed executed to Hobson and Van Dusen.

2. At the trial there was received in evidence a map
on which were delineated lines representing tract No. 1,
as originally surveyed and as at present located, and also
tracts numbered 2 and 3.   The map is sketched on a uni-
form scale depicting the relative sizes of the several tracts
and the respective distances from each other.   The upper
line of tract No. 1, as originally surveyed, has, in the 31
years immediately preceding 1910, moved westward about
3,000 feet, or an average progression of nearly 97 feet
annually.   From the time the first deed to tract No. 1
was executed to 1891, when tide flats in the Columbia
River were authorized to be sold 12 years had elapsed
during which the average movement of the upper line of
the sand had been 1,164 feet.   It will be remembered that
the first deed of this tract stated that the premises con-
tained 21.37 acres.   The confirmatory deed described the
land by courses and distances, reciting that the real prop-
erty specified embraced the same area so that the survey
of the premises must have been made prior to the execu-
tion of the original deed.   It will be presumed, in the
absence of any evidence to the contrary, that things have
happened in the ordinary course of nature.   Section 799,
subd. 28, L. O. L.   Since the average movement of the
upper part of the sand island had been in 12 years 1,164
feet, the width of such tract, as originally surveyed, was
greater than the number last stated, and hence there was
some evidence tending to show that in 1891 a part of the
island as at first surveyed remained intact to which

accretions could have been formed, and hence no error was committed in the respect asserted.

3. The act, ratifying the titles to all tide flats in the Columbia River that had been sold, limited the confirmation to purchasers who had not secured from the State to exceed 320 acres of that class of land. Laws Or. 1899, p. 57. It is insisted that, since plaintiffs offered no evidence tending to show that Hobson and Van Dusen had not purchased tidelands in excess of the quantity specified, there was a failure of proof respecting the establishment of the title to their lands, and, that being the case, an error was committed in granting the relief prayed for in the complaint. The first deed to the tide flats having been executed February 17, 1879, the application to purchase the premises undertaken to be conveyed was evidently predicated upon the statute then in force. That act authorized the State Land Board to sell tidelands owned by the State in such quantities as should be deemed most advantageous to the grantor, not exceeding 320 acres to any one person. Laws Or. 1878, p. 42, § 4. All applications to purchase such lands were required to be accompanied by an affidavit of the applicant to the effect, *inter alia,* that he had not directly or indirectly made any previous purchases of lands from the State, nor had any person for him, which together with the lands specified in the application exceeded 320 acres. Laws Or. 1878, p. 42, § 5. In order to have secured a greater quantity of tidelands than thus limited, Hobson and Van Dusen must have been guilty of perjury, and since it will be presumed that a person is innocent of crime, Section 799, subd. 1, L. O. L., the execution of the deed for the island made a *prima facie* case respecting the title which was perfected by confirmation, thereby imposing upon the defendants the burden of overturning such degree of proof, and no error was committed as alleged.

The trial court found that the premises included within the boundaries of the deed executed to Warren were accretions to the land referred to as tract No. 1; that such gradual accumulations of earth, sand, etc., designated as tract No. 2, were not uncovered at ordinary low water and exposed only at an extreme reflux of the tides; and that the conveyance was void and no title vested in him by reason of the execution of the State's deed. It is maintained that these findings of fact are not supported by evidence, and that the conclusion of law based thereon is erroneous. Plaintiffs' counsel called 21 witnesses, most of whom had been engaged for many years in operating steam vessels plying between Astoria and other places on the Columbia River. These persons severally testified that at ordinary reflux, or what is generally called a zero tide, no part of the island embraced in the deed executed to Warren was ever uncovered. These sworn statements were disputed by four of defendants' witnesses, each of whom testified that tract No. 2 was a separate island, and between it and tract No. 1, at low tide, was a shallow channel.

The trial court also found that, when Lena F. Welch obtained her deed to tract No. 3, the premises described were not tide lands, but wholly covered by water; and that the conveyance was void and she acquired no title thereby. The testimony as to this tract is nearly identical with that respecting tract No. 1, and the overwhelming weight of the sworn declarations fully support the findings of fact as made.

4, 5. Tracts numbered 2 and 3 being exposed only at unusually low water, the question to be considered is whether or not the court erred in determining that such parcels of real property were not tidelands. Mr. Justice LORD, in *Andrus* v. *Knott,* 12 Or. 501 (8 Pac. 763), makes the inquiry, "What is meant by the phrase 'tideland'?" and answers the question by saying, "It must, then, be

such land as is affected by the tide, that lies between ordinary high-water mark and low-water mark, and which is alternately covered and left dry by the ordinary flux and reflux of the tides." In *Elliott* v. *Stewart*, 15 Or. 259 (14 Pac. 416), again defining such class of real property, an excerpt from the case of *People* v. *Morrill*, 26 Cal. 336, 353, is adopted, as follows: "The land usually overflowed by the neap or ordinary tides." In *Gerrish* v. *Proprietors of Union Wharf*, 26 Me. 384 (46 Am. Dec. 568, 572), in construing an enactment which declared that the proprietors of land "shall have property to the low-water mark," it was held that the line referred to evidently meant a mark which could be readily ascertained and established to which the tide at its ebb usually flowed; the court saying: "That place, to which the tide might ebb under an extraordinary combination of influences and of favoring winds, a few times during a generation, could not form such a known boundary." In reaching that conclusion Mr. Justice SHEPLEY of the Supreme Judicial Court of Maine criticises a decision of the Supreme Judicial Court of Massachusetts as follows:

"In the case of *Sparhawk* v. *Bullard*, 1 Metc. 95, low-water mark was considered to be that place, to which the tide ebbed, when from natural causes it ebbed the lowest. No authority is there cited, or reason stated for this difference of opinion."

Referring to the determination reached by the Maine court, a noted author says:

"But the reason for limiting the king's title to medium high tide does not apply to limit that of the subject to medium low tide. The reason for extending the title of the riparian owner to low-water mark is to preserve his access to the water, and he must therefore have a right to go until he reaches the water even at its lowest ebb." 1 Farnham, Waters & Water Rights, Sec. 45c.

In the case at bar, as understood from the testimony and from the meaning of the word "zero" as applied to

a state of the tide, the ordinary or average low-water mark was not accepted as the boundary of the grant of the flats, nor the most extreme reflux tide, but a medium line which presupposes the right of a purchaser of this class of real property at all times to have access to the water.

It appears from the testimony that there was established at Astoria on a permanent object a bench mark evidencing its elevation as compared with the sea level, and that there was also put up at that city a tide gauge on which was placed a zero mark as the supposed standard of low tide.   Judicial notice will be taken of the coast and geodetic survey whereby the ebb and flow of the tide in harbors, bays, and navigable rivers on the Pacific Coast is observed at regular intervals, usually for a lunar month or more, and from the information thus obtained a "mean lower low water," unaffected by strong prevailing winds or abnormal barometric conditions, is marked on a gauge as an assumed datum-level designated as zero, the point of which below the bench mark is carefully noted, so that in case of injury to or loss of the tide gauge the zero can be re-established from the bench mark.   The depth of navigable water on all bars and shoals is accurately taken with reference to the zero mark, and, based on the knowledge thus secured, government charts for this region are prepared in aid of navigation.   Tide tables are printed by the coast and geodetic survey office showing at various places the time and height of high and low water, to find the actual depth of which at any designated port and time there must be added to or subtracted from the soundings given on the chart the tabular heights noted in the tide tables. Tide Tables for the Year 1912, p. 161 *et seq.*

Tracts numbered 2 and 3 were not uncovered by the "mean lower low water," but were sometimes exposed when the tide fell below the zero line; whether from wind blowing off shore or from a high barometer conducing to

an extraordinary low water does not appear from the testimony. It is believed that the parcels of real property described in the deeds from the State to Warren and to Lena F. Welch were not tidelands within the meaning of that phrase, as heretofore determined by this court, but were parts of the bed of the stream which the legislature did not intend to convey. *Johnson* v. *Knott,* 13 Or. 308, 312.

6, 7. As the State Land Board was powerless to grant any part of the bottom of the Columbia River without express enactment, the deeds executed for such lands were void, and a decree tantamount to declaring such effect may be legally given in a collateral proceeding where adverse rights of strangers are necessarily involved. *Anderson* v. *Roberts,* 18 John. 515 (9 Am. Dec. 235, 239).

8. The owners of tract No. 1 are entitled to the accretion that logded on and thus formed a part of such tide flats. *Taylor Sands Fishing Co.* v. *State Land Board,* 56 Or. 157 (108 Pac. 126). The tideland island as originally granted has gradually moved westward, and no part of it is now exposed at low tide within the description given in the confirmatory deed. The title of Hobson and Van Dusen and of their successors in interest extended to all accretions made to such land, and, though the surface of the original island may have been washed away, the possession of the whole tract of such imperceptible deposits of earth, sand, and gravel follows the paper title. *De Lassus* v. *Faherty,* 164 Mo. 361 (64 S. W. 183: 58 L. R. A. 193, and notes). If it be conceded that plaintiffs' right to the possession of the island, as it was described in the confirmatory deed, would revive in case the sands forming its surface should again be exposed at low tide, the assumed legal principle does not militate against them or defeat their title to the accretions. They and their predecessors in interest possessed the means whereby they had just possession of each particle of sedi-

mentary deposit as it imperceptibly accumulated at the foot of the island, and this title was not lost because the head of tract No. 1 has gradually been washed away.

Believing that the trial court made correct findings of fact, and based thereon deduced proper conclusions of law, the decree is affirmed.                    AFFIRMED.

Decided October 1, 1912.
. ON PETITION FOR REHEARING.
(126 Pac. 604.)

MR. JUSTICE MOORE delivered the opinion of the court.

9. It is maintained in a petition for a rehearing that the right of a riparian owner to accretions to an island in the Columbia River is limited to an extension of his lateral boundaries at right angles with the thread of the stream, and that he is not entitled to any of the gradual and imperceptible accumulations of soil deposited at the head or foot of such an island; and, this being so, the decree should have been reversed. The doctrine thus contended for is asserted by a text-writer (3 Farnham, Water & Water Rights, p. 2484), who, in support thereof, cites the case of *Griffin* v. *Johnson,* 161 Ill. 377 (44 N. E. 206). The rule established by the Supreme Court of Illinois is that the fee of a riparian owner of lands in that State bordering on the Mississippi River extends to the middle of the main channel of that stream. *St. Louis* v. *Rutz,* 138 U. S. 226, 242 (11 Sup. Ct. 337: 34 L. Ed. 941). In that case, in determining the right of a riparian owner of such an island, it was held that if dry land was formed upon that part of the bed of the river which is owned in fee by such proprietor the property belongs to him; and that the right of accretion to such an island cannot be so extended, lengthwise of the river, as to exclude riparian owners above or below such island from access to the river.

The rule referred to does not obtain in Oregon, where the fee in the bed of navigable rivers within its borders was originally owned by the State; and when it sold and conveyed an island in such a stream the purchaser of the premises became entitled to all accretions thereto. The right of access is an incident of riparian ownership; and if a part of the head or foot of an island in a navigable stream in Oregon were sold and conveyed by the State the purchaser, in case the rule in Illinois obtained here, could not approach the river after any accretions had been made to his premises. As the right to such imperceptible deposits exists in favor of riparian proprietors of an island in the case supposed, it must also be recognized in the case at bar in favor of owners of the entire island, whose rights of access to the river can lawfully be exercised at any point along the margin of their land.

10. In the case at bar, after the cause was submitted, the defendants' counsel moved the court for leave to offer further evidence respecting the state of the tide when the sand islands were severally surveyed; but the motion was denied. This application was addressed to the sound discretion of the trial court, and, as no showing was made that discriminating judgment was not properly exercised, no error was committed in this respect.

Believing that the former opinion correctly determined all the matters in controversy, the petition for a rehearing is denied.          AFFIRMED: REHEARING DENIED.