Argued July 9, modified July 31, rehearing denied September 8, 1914.

## BAY CITY LAND CO. *v.* CRAIG.

### (143 Pac. 911.)

**Navigable Waters—Littoral Rights—"Seashore"—"Tide-land."**

1.    The "seashore" or "tide-lands" include all lands lying between
high-water mark and low-water mark at ordinary tide.

**Deeds—Condition Subsequent—Breach—Re-entry by Grantor.**

2.    Upon re-entry for a breach of a condition subsequent, the
grantor becomes seised of the estate that he had at the making of the
conditional conveyance, free from any subsequent lien or encumbrance.

[As to what language creates a condition subsequent, see note
in 79 Am. St. Rep. 747.  As to manner of taking advantage of
breach of condition subsequent, see note in 93 Am. St. Rep. 572.]

**Deeds—Condition Subsequent—Breach—Re-entry by Grantor.**

3.    When a grantor re-enters, or brings ejectment for breach of
condition subsequent and recovers the estate, it revests in him, free
from all claim of the grantee for outlays or improvements.

**Deeds—Condition Subsequent—Breach—Re-entry by Grantor.**

4.    Where land was conveyed upon condition that the grantee erect
and operate a sawmill, and the deed was entitled to record and was

duly recorded, it gives notice of its condition to a creditor of the grantee, and where there was a breach of a condition subsequent before action commenced by the creditor against the grantee, the grantor, on re-entry, became the owner of all machinery in the sawmill which was so attached as to become fixtures and constitute a part of the realty.

**Fixtures—Effectiveness of Severance.**

5. Where a condition subsequent requiring the erection and operation of a sawmill was broken, but before re-entry by the grantor an engine and a dynamo which had been used in the mill were borrowed by an electric light plant, and not returned to the mill or returned and not again put in use, they became personal property subject to attachment for the debts of the grantee.

**Fixtures—Attachment to Grantee—Adaptions.**

6. Where a condition subsequent required a grantee to erect and operate a sawmill, engines, steam boilers, circular saws, log carriage, and fittings, and other machinery, attached to the mill became a part of the realty, and on breach of the condition the grantor was entitled to enjoin their sale on attachment against the grantee.

From Tillamook: WILLIAM GALLOWAY, Judge.

This is a suit by the Bay City Land Company, a corporation, against John S. Craig and H. Crenshaw. The lower court entered a decree dismissing the complaint, and plaintiff appeals. The facts are set out in the opinion of the court.

MODIFIED.     REHEARING DENIED.

For appellant there was a brief over the names of *Messrs. Kollock & Zollinger* and *Mr. H. T. Botts,* with an oral argument by *Mr. Botts.*

For respondents there was a brief submitted without argument by *Mr. Sidney S. Johnson.*

Department 1.  MR. JUSTICE RAMSEY delivered the opinion of the court.

This suit was commenced on the 9th day of December, 1912, to obtain an injunction restraining the defendants from selling certain property described in the complaint at sheriff's sale, etc. The court below dismissed the plaintiff's complaint, etc., and it appeals.

The plaintiff is a corporation, and H. Crenshaw, one of the defendants, is sheriff of Tillamook County and is sued in his official capacity.

The defendant John S. Craig, on the —— day of September, 1912, commenced an action against the C. L. Fox Lumber Company to recover $388.38, and the further sum of $78.38, and the further sum of $50, and interest and costs, in the Circuit Court of Tillamook County, and caused a writ of attachment to issue against the property of the defendant. This writ was levied upon the property described in the complaint, to secure the payment of any judgment that the plaintiff in said action should obtain against the defendant therein.

On the —— day of November, 1912, the plaintiff in said action obtained in said Circuit Court of Tillamook County, a judgment against the defendant for said sums of money and an order for the sale of said attached property. A writ of execution was issued out of said court upon and to enforce said judgment and order of sale, and said sheriff, at the instance of said judgment creditor, advertised for sale according to law the property that had been attached as stated *supra*. This suit was commenced to obtain a decree enjoining the sale of said property. The property advertised for sale is described as follows:

1 250 H. P. double engine with general fittings.
1 20 H. P. single engine      "      "      "
2 steam boilers            "      "      "
2 circular saws with log carriage and fittings.
1 upright saw with frame.
1 planer and matcher.
1 edger machine.
1 automatic grinder.
1 dynamo.
1 rheostat.
1 voltmeter.

The plaintiff claims that said property is a part of a sawmill, and is real property, belonging to the plaintiff.

The complaint alleges, *inter alia,* the following:

"That thereafter the said John S. Craig obtained a judgment in said action against the said C. L. Fox Lumber Company for the sum of $388.38, with interest at the rate of 6 per cent per annum from August 31, 1912, and a further sum of $78.38, with interest thereon at the rate of 6 per cent per annum from December 23, 1911, and the further sum of $50, with interest thereon at the rate of 6 per cent per annum. That all of the above-described property is owned in fee simple by the plaintiff herein, and has been so owned by it for more than a year last past. That said property constitutes and is a part of the certain sawmill situate upon the following described real property in the county of Tillamook, State of Oregon, to wit: The south half of block numbered 22; the south half of block numbered 23; the south half of block numbered 24; the south half of block numbered 25; the south half of block numbered 26; the south half of block numbered 27; and the south half of block numbered 28; and that part of the south half of block numbered 29 lying south and west of the right of way of the Pacific Railway & Navigation Company, as surveyed and established, all in Water Front Addition to Bay City, Oregon. Also beginning at the southwest corner of said block numbered 22; thence running easterly along the south line of said Water Front Addition to the west boundary line of the above-mentioned right of way; thence running southeasterly along the westerly line of said right of way to a point where said line intersects the base line; thence running westerly along said base line to a point directly south of the above-mentioned place of beginning; thence running north to said place of beginning; excepting the right of way 100 feet wide conveyed to the United Railways Company, extending across the east end of

all of said premises. And all of said described property so taken and levied upon by the defendants herein and the said sawmill constitute and are portions of the said described real estate and have been constituent portions thereof for more than a year last past. That during all of said time said sawmill has been a building permanently built and attached to the said real estate, and the said property so taken and levied upon has during all of said time been and constituted essential and constituent parts of said building, permanently attached and constructed therein and thereto with the expectation and intent on the part of the builders, owners, and occupants thereof that said property so taken and levied upon should be and remain a portion of said building, and that said building should be and remain a constituent part of said real estate. That in case said property so levied upon shall be sold, said defendants and the purchaser or purchasers thereof will sever the said described property from the said real estate, and will irreparably damage and injure the same and prevent the plaintiff from using said sawmill for the purposes for which it was constructed.''

The defendants filed an amended answer to said complaint denying the most of the allegations thereof and setting up new matter. Most of the new matter of the answer was denied by the reply. The evidence was taken and a decree rendered in favor of the defendants.

The plaintiff obtained title to the land upon which said mill is situated by a chain of conveyances from the State of Oregon, through various persons, *provided* the land upon which the sawmill is situate is *tide-land*.

1. The first question for consideration is, what is "tide-land"? Coulson & Forbes, Waters (3 ed.), a recent English work (page 21), says:

''The 'seashore' may be defined as that portion of the land adjacent to the sea which is alternately covered and left dry by the ordinary flux and reflux of

the tides. Although, in common parlance, the word 'shore' has often a more extensive meaning—taking in all that extensive belt of waste ground or strand, shingles, and rock liable to the action of every kind of tide—yet it is now finally settled that in legal intendment no more of that unclaimed tract is seashore than that portion *which lies between high and low water mark at ordinary tides.*"

"Seashore," as defined by the authors just quoted, is synonymous with "tide-land" as used in this country.

Farnham, Waters and Water Rights, pages 227, 228, says:

"The tract designated as shore, which may be a parcel of a manor, but is *prima facie* in the (English) crown, is that strip lying along tide-water over which the tide flows between the line of ordinary high tide and *the line of the* lowest tide. * * As said by Lord Hale, the shore which (in England) belongs to the king is not that covered by the high spring tide, but the ordinary or neap tide. It has been said that low-water mark is that place to which the tide usually ebbs, and is not determined by neap tides or tides caused by an unusual combination of causes. But the reason for limiting the king's title to medium high tide does not apply to limit that of the subject to medium low tide. The reason for extending the title of the riparian owner to low water is to preserve his access to the water, and he must therefore *have a right to go until he reaches the water even at its lowest ebb.* In its broadest significance, the term 'tide-lands' means any land over which tide-water flows. But in ordinary usage, it is synonymous with 'shore'; so that when a provision is made for disposal of tide-lands, only those between high and low water mark are meant."

In *People* v. *Davidson*, 30 Cal. 379, the court defines the phrase "tide-lands," as used in the legislation of the State of California, as including "such lands as

are covered and uncovered by the tide,'' and states that it does not include lands below low-water mark and permanently submerged.

38 Cyc., page 303, defines ''tide-lands'' thus:

''That portion of the shore or beach covered and uncovered by the ebb and flow of ordinary tides,'' etc.

In *Andrus* v. *Knott,* 12 Or. 503 (8 Pac. 763), the court, discussing the meaning of ''tide-lands,'' says:

''It would seem to correspond to or be synonymous with 'shore' or 'beach,' and this, at common law, is that land which lies between ordinary high-water mark and low-water mark. * * It must, then, be such land as is affected by the tide, that lies between ordinary high-water mark and low-water mark, and which is alternately covered and left dry by the ordinary flux and reflux of the tides.''

In *Van Dusen Inv. Co.* v. *Western Fishing Co.,* 63 Or. 15, 16 (124 Pac. 680), the court says:

''Tracts numbered 2 and 3 being exposed only at unusually low water, the question to be considered is whether or not the court erred in determining that such parcels of real property were not tide-lands. * * In the case at bar, as understood from the testimony and from the meaning of the word 'zero,' as applied to a state of the tide, the ordinary or average low-water mark was not accepted as the boundary of the grant of the flats, nor the most extreme reflux tide, but a medium line which presupposes the right of a purchaser of this class of real property at all times to have access to the water. * * Tracts numbered 2 and 3 were not uncovered by the mean lower low water, but were sometimes exposed when the tide fell below the zero line; whether from wind blowing offshore or from a high barometer conducing to an extraordinary low water does not appear from the testimony.''

Sir Matthew Hale, in De Jure Maris, Chapter 4, says:

"And this shall suffice for the king's right in the shore of the sea, viz., the land lying between the high water and the low water mark at ordinary tides."

In *Commonwealth* v. *Charlestown,* 1 Pick. (Mass.) 182 (11 Am. Dec. 161), Mr. Chief Justice PARKER says:

"And as this right of the sovereign extends to ordinary high-water mark, so that the shore, which is the space between high water and low water mark, belongs also to the sovereign; the property of the owner of the upland reaching only to that line which limits the waters in the ordinary course of the tides."

We find that shore or tide lands include all lands lying between high-water mark and low-water mark at ordinary tides.

We have examined the evidence and we find therefrom that the sawmill referred to in the pleading and in the evidence was built and is situate on a tide flat lying between ordinary high and low water mark, and the land upon which it stands is, and was when it was built, tide-lands. There is some conflict in the evidence, but the weight thereof shows that the mill stands on tide-lands. It is not necessary to set forth the evidence.

On and prior to February 26, 1908, the plaintiff was the owner of the real premises described in the complaint, including the land upon which said sawmill was built and is situate, and, on said day, conveyed said premises to C. L. Fox upon certain stated conditions subsequent to be performed by him, his heirs or assigns, which conditions were fully set forth in a deed of conveyance by which said premises were so conveyed. Said deed of conveyance was so executed, as to be entitled to be recorded in the records of deeds of said county of Tillamook, and it was duly recorded on page 188 of Book 9 of Deeds of said county on the 26th day of September, 1908.

On the 23d day of July, 1908, said C. L. Fox duly conveyed said real premises above referred to to the C. L. Fox Lumber Company, a corporation, by deed of conveyance. After said conveyance was so made to said company, it erected on a part of said real premises the sawmill referred to in the pleadings, and placed in said sawmill the machinery that was attached in the action at law referred to *supra,* with the intention that said machinery should form a part of said sawmill and its equipment, and be used by said company as a necessary and proper part of said sawmill in operating the same.

In the deed of conveyance made as stated *supra* by the plaintiff to said C. L. Fox the following conditions subsequent were set forth:

"(1) That the said grantee shall erect upon said premises a sawmill with a daily capacity of at least 25,000 feet of lumber, to be completed not later than August 1, 1908, and to be completely equipped with machinery and fixtures and in running order by said date; and

"(2) That said grantee, his heirs or assigns shall continue for a period of five years next after August 1, 1908, to operate said sawmill in the manufacture of lumber, unless prevented from doing so by fire or other unavoidable casualty and during such time shall keep said mill in good condition of repair; and

"(3) That in case said grantee, his heirs and assigns shall fail to erect said sawmill as aforesaid within the time above limited, or in case, having erected same, the said mill should be abandoned or allowed to stand idle for any other reason than above provided, for a period of twelve months, or in case of the destruction of said mill by fire or other casualty within said period of five years, the same should not be repaired or reconstructed to equal its former running capacity within a period of twelve months, or in case said mill shall for any reason not be operated during said period of five years for a continuous period of twelve months, then

upon the failure of any of the above conditions, prior to the 1st day of August, 1913, said premises shall revert and revest in the above-named grantor, its successors and assigns, who shall thereupon become the owners of said above-described premises as fully and absolutely as if this deed had not been made.''

The consideration for the execution of said deed by the plaintiff to said C. L. Fox was that said Fox and his assigns should comply with the said conditions of said deed. The C. L. Fox Company had full knowledge of the conditions of said deed,· and with such knowledge it entered into possession of said real premises and occupied the same, and, after said mill was constructed, it operated the same for about a year.

In May, 1910, or prior thereto, the said C. L. Fox and the C. L. Fox Lumber Company abandoned said sawmill, and ever since that date allowed said sawmill to stand continually idle and unused. Said mill had not been run or operated at all ·for a period of 29 months immediately prior to October 29, 1912, and at the last-named date the plaintiff herein commenced against the said C. L. Fox Lumber Company an action at law to recover from it possession of the real. premises described in the complaint herein, including said sawmill, for the failure of said C. L. Fox and the C. L. Fox Lumber Company to keep and perform the said conditions of said deed, in that they had failed for 29 months to run or operate said mill. Process was served on said C. L. Fox Lumber Company in said action. On November 13, 1912, judgment in said action at law was rendered by the Circuit Court of Tillamook County in favor of the plaintiff therein against the C. L. Fox Lumber Company for the recovery of the possession of all of said real premises, including the premises upon which the said mill is situate.

2. Upon re-entry for a breach of a condition subsequent, the grantor becomes seised of the estate that he had at the time of the making of the conditional conveyance, free from any subsequent lien or encumbrance: 13 Cyc. 712, 713; *Adams* v. *Ore Knob Copper Co.* (C. C.), 7 Fed. 634, 640; *Barker* v. *Cobb,* 36 N. H. 348; *Rowell* v. *Jewett,* 71 Me. 408; *Maginnis* v. *Knickerbocker Ice Co.,* 112 Wis. 385 (88 N. W. 300, 69 L. R. A. 833); 4 Kent's Com. 126; 1 Shep. Touch. 121.

In *Adams* v. *Ore Knob Copper Co.* (C. C.), 7 Fed. 634, 640, the court says:

"Upon re-entry or claim the grantor or his heirs become seised of the estate had at the time of making the grant upon condition, freed from any subsequent lien, encumbrance, or limitation."

In *Barker* v. *Cobb,* 36 N. H. 348, the court says:

"And by his entry he became seised of the demanded premises; for it is a general rule of law that he who enters for condition broken becomes seised of his first estate, *and thereby avoids all intermediate charges and encumbrances.*"

3. When the grantor of an estate upon condition subsequent enters thereupon or brings ejectment for condition broken and recovers the estate, it revests in him not only freed from encumbrances put upon it by the conditional grantee, but free, also, from all claim of the grantee for outlays or improvements upon the property conditionally conveyed.

In *Rowell* v. *Jewett,* 71 Me. 408, the court says:

"The grantee in a conditional deed, if he refuses to perform the conditions upon which his title depends, forfeits his estate none the less, because he may have paid some portion of its value by way of consideration or to relieve it from encumbrance. The estate reverts to the grantor as a matter of legal right, and if he sees fit to enter for the breach of the condition, and to claim

a forfeiture, the estate revests in him to all intents and purposes, *without regard to the outlays which the conditional grantee may have made on account of it.*"

In 2 Devlin, Deeds (3 ed.), Section 969, the author says, *inter alia:*

"When the grantor is entitled to a reversion of the estate for condition broken, his right is not affected by the fact that the grantee has made oulays" on the property.

4. In this case the condition of the deed made to said C. L. Fox had been broken before John S. Craig commenced his said action against the C. L. Fox Lumber Company to recover the debt due him and attached the machinery in said mill, as stated *supra*. The deed of conveyance containing said conditions had been duly recorded in the public records of Tillamook County, as stated *supra,* and this record imparted notice of said conditions to said John S. Craig, and he attached said property with notice thereof. When the plaintiff herein recovered said real premises upon which said sawmill was situate, as stated *supra,* the title to said real premises and the mill thereon became revested in the plaintiff, and hence the plaintiff became the owner of all the machinery in said mill that was so attached as to be fixtures and constitute a part of the realty upon which the mill is situate.

In constructing said mill, piles were driven into the ground and capped, and sway braces were put on the piling below, and the mill was built on these piles. Two engines were put in the mill, and also a smaller engine that ran the dynamo and planer. Two boilers, also, were bolted down to the building. The boilers were set upon brick foundations. There were two large circular saws in the mill; also a log carriage. The machinery was attached to the mill in the same

manner that such machinery is usually attached to
mills. It was bolted down. Some was spiked down.
The log carriage ran on wheels in the usual way.
There was in the mill an upright saw in a frame. The
planer and matcher and edger and a grinder were
bolted to the mill. The dynamo, rheostat and volt-
meter were attached to the mill. The machinery and
fixtures were attached to the mill in the usual manner,
and formed a part of it, and all were proper and
necessary parts of the mill plant, and were used in
running and operating the mill. The mill was oper-
ated about a year. The evidence shows that all of
the machinery was put in the mill and attached in the
usual manner, and that all of it remained in the mill
until the evidence was taken except a small engine
and a small dynamo.

Mr. J. O. Bozarth, a witness for the plaintiff, on
page 43 of the evidence, testified that, so far as he
knows, all the machinery is attached to the mill, except
the small engine which the electric light plant bor-
rowed from the mill about two years before the witness
gave his evidence, and a small dynamo. He says that
they used the engine in the electric light plant a while.
He thinks that the engine was returned to the mill, and
says that he was so informed. He said that the
dynamo was still at the electric light plant, but not in
use at the time he testified. Mr. John S. Craig says,
in effect, that said engine and dynamo are in posses-
sion of the electric light plant.

5. The law of fixtures is, in many respects, conflict-
ing; but it will not be necessary to go into it at length.
Bronson, Fixtures, a recent work, in Section 19, says:

"The criterion of annexation, as a sole test in de-
termining the character of a chattel, or as a test in
arriving at the intention of the parties, early became

inadequate.  The question whether a chattel is annexed or not is often exceedingly dubitable, and one wherein many fine distinctions may be drawn.  With this as a sole test, it is necessary to consider every chattel a fixture that is affixed in the slightest degree. But this is plainly inefficient, for the reason that there is little or no fastening of the chattel to the freehold, as when light machinery is connected by belting to a mill, or where a bucket is hung in a well.  So, where the essential parts of some machine are temporarily severed for purposes of repair, or when there are duplicate sets not attached, but adapted to the use of the realty, in these cases the test of annexation would prove fruitless and abortive in arriving at the true character of the chattel.  Hence there has arisen another test— that of adaptation of the chattel to the use of the freehold—which, in recent years, has been frequently applied. * *

"The term 'adaptation' to the use of the freehold is not freely defined by the courts or text-writers; most of the cases are quite content to state it as one of the tests or requirements of a fixture.  It seems, however, that the term comprehends the peculiar fitness of the chattel to the use of the freehold, and the devotion to the special use for which it is adapted and only fitted. Within the meaning of the term is also included the fact that the chattel is necessary to the complete use of the freehold, or is a necessary part of some whole which is part of the realty.  This application arises most frequently where machinery is placed in a mill or manufactory for a special purpose or end, and is particularly and specially fitted for that purpose.  In such cases that adaptation of the chattel shows the intent to make it an irremovable fixture.  So, where pieces of machinery, in themselves unattached and personal, are necessary and adapted to the use of the realty, and this is so, even though the parts are duplicate parts, and at the same time are really not in use in connection with the realty": See, also, 19 Cyc. 1042–1045; 13 Am. & Eng. Ency. Law (2 ed.), 608–613; Ewell, Fixtures (2 ed.), bottom pp. 25–28.

The machinery was attached in the usual manner and it was a part of the realty; the engine and the dynamo that were "borrowed" by the electric light plant and used by it in carrying on its business were severed from the realty by the act and consent of the C. L. Fox Lumber Company. If these machines had been removed from the mill for the purpose of having them repaired and then been returned to their places in the mill, they would have remained as fixtures. But it appears that the C. L. Fox Lumber Company ran the mill about a year, and then shut it down and practically abandoned it, and forfeited it and the real premises to the plaintiff as stated *supra*. While this mill was thus shut down, the electric light plant, with the consent of the Fox Company, "borrowed" the engine and the dynamo and used them in carrying on its business. The evidence shows that the electric light plant still has the dynamo, and there is no evidence, but hearsay, to show that the engine was ever returned to the mill. Under the facts, we hold that the engine and dynamo were severed from the mill and became personal property before the levy of the attachment referred to in the pleadings, and that they were the personal property of the C. L. Fox Lumber Company, and subject to execution for the debts of said company.

According to the pleadings, the defendant H. Crenshaw, as sheriff, in the case of John S. Craig against the C. L. Fox Lumber Company, attached, *inter alia* as the property of the said company, two engines and one dynamo, one of said engines being a double engine and the other being a single engine. According to the evidence, the engine that was severed from the mill and became the personal property of said company, and was "borrowed" by the electric light plant, was

a small engine. The dynamo that we hold belonged to said company was the small dynamo that was taken from the mill and used by the electric light plant.

6. We find that the plaintiff is entitled to a decree perpetually enjoining the defendants from selling any part of the property described in the pleadings as having been attached in the action of *John S. Craig* v. *C. L. Fox Lumber Company,* except the said small engine and small dynamo that were in the possession of the electric light plant and used by said plant in carrying on its business. We find that said small engine and small dynamo are not the property of the plaintiff and that they were subject to execution for the debts of the C. L. Fox Lumber Company, and that neither party should recover costs in this court or in the court below.

The decree of the court below should be modified so as to conform to the foregoing findings.

The decree of the court below is modified, and this cause is remanded to the court below, with directions to enter a decree there in accordance with the foregoing findings.          MODIFIED.   REHEARING DENIED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE MOORE and MR. JUSTICE BURNETT concur.

---

Argued May 6, affirmed June 9, rehearing denied September 8, 1914.